## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **GASOLOGY, LLC** | * | **CIVIL ACTION NO. 25-1328** |
| **VERSUS** | * | **JUDGE ELDON E. FALLON** |
| **DAN O. DINGES AND MARY SUSAN VICK** | * | **MAGISTRATE JUDGE KAREN WELLS ROBY** |
| *   *   *   *   *   *   *   * | | |

## ORDER & REASONS

Before the Court are two motions, one filed by Plaintiff Gasology, LLC and one filed by Defendants Dan O. Dinges and Mary Susan Vick. Gasology filed a motion to stay pending arbitration R. Doc. 6. Defendants oppose the motion. R. Doc. 13. Plaintiff replied. R. Doc. 14. Defendants later filed a motion to dismiss for lack of personal jurisdiction or, alternatively, to transfer venue. R. Doc. 10. Plaintiff opposes the motion. R. Doc. 20. Defendants replied. R. Doc. 21. The Court, upon request of Defendants, set oral argument on both motions for Wednesday, September 17, 2025, at 9:00 a.m. Considering the record, briefing, oral argument, and applicable law, the Court now rules as follows.

### I.    BACKGROUND

Plaintiff Gasology, LLC ("Gasology") is a Louisiana-domiciled company organized under the laws of Delaware that sought to create a "motor fuel marketplace" in the form of an online platform that "connects fleets and drivers to suppliers, offering the first-ever fuel buying platform in a highly fragmented, outdated industry." R. Doc. 1-1 at 2. At all relevant times, Gasology was a start-up company seeking to graduate from seed investments made by individuals and family offices to a successful and substantial $35 million venture capital fundraise. *Id.* at 2–3. One such individual seed investor is Houston-domiciled Defendant Dan O. Dinges ("Dinges"). Prior to engaging in the alleged wrongdoing that forms the basis of this suit, Dinges executed a handful of

Simple Agreements for Future Equity, or SAFEs, with Gasology. *Id.* These SAFEs provided that Dinges would give Gasology a set amount of money in exchange for the opportunity to receive equity in Gasology in the future. *See, e.g.*, R. Doc. 10-2 at 5–12.

Gasology avers that by late 2023, it wished to take the leap into venture capital fundraising and sought a financial advisor to guide it through a Series A funding round. R. Doc. 1-1 at 3.  At the same time, Gasology "was cash constrained and needed interim equity funding of approximately $250,000 per month to bridge to the Series A closing." *Id.* Presumably reaching out to its existing base of SAFE investors, Gasology avers that Defendant Dinges agreed to provide this interim equity funding—if Gasology retained his wife, Defendant Mary Susan Vick ("Vick") to be Gasology's exclusive financial advisor and Series A fundraiser. *Id.*

Vick is a Houston-domiciled, multiple-FINRA-licensed representative who is affiliated with SP Securities, LLC ("SP Securities"), a licensed FINRA broker dealer. *Id.* Separately, Vick owns her own consulting firm, Syren Capital, LLC ("Syren Capital"). *Id.* Gasology executed a contract with Syren Capital in November 2023 (the "Syren Contract"), which provided that Vick's company would serve as Gasology's exclusive financial consultant with respect to the Series A fundraise. *Id.* Vick in her individual capacity is not a party to the Syren Contract. *See* R. Doc. 10-3 at 6–17.

Gasology avers that within two months of the Syren Contract commencing, Vick and her husband had already conspired to wrest control of the company away from Gasology and into their own hands. R. Doc. 1-1 at 4. It represented at oral argument that Dinges's communications with Gasology's principal, Joseph LeBlanc (LeBlanc)—copies of which are not in the record—evince that Dinges and Vick were conspiring together to attempt a hostile takeover of Gasology. In its Petition, Gasology alleges that Vick communicated to Gasology that she and her husband "had

gone behind Gasology's back and marshalled some of Gasology's existing investors for commitments to express that they would not provide additional . . . funding to starve Gasology of working capital." *Id.* Moreover, Defendants allegedly communicated to Gasology that Dinges would cease providing the promised interim equity funding unless Gasology agreed to "more onerous terms . . . that would materially disadvantage Gasology." *Id.*

As a result of this alleged tortious activity, Gasology filed the instant suit against Dinges and Vick in Louisiana state court, which Defendants timely removed. *See* R. Doc. 1. Beyond its claims that Dinges and Vick harmed their company through tortious acts, Gasology also brings various contract claims against both Dinges and Vick. R. Doc. 1-1 at 5–6. Gasology represented at oral argument that it brought suit against Vick in her individual capacity for breaching the Syren Contract and against Dinges for breach of his implied contract to provide the promised interim equity funding.

Notably, Plaintiff filed this suit on the same date that it filed a Statement of Claims with FINRA, which initiated arbitration proceedings between it, Vick, and SP Securities. R. Doc. 1-1 at 1; *see also* R. Doc. 6-1 at 4 (explaining that Gasology filed this lawsuit and the FINRA arbitration documents on the same date and "br[ought] nearly identical claims").

## II.    PRESENT MOTIONS

Before the Court are two motions, one requesting a stay of this entire case pending arbitration, and one requesting this Court assess whether it has personal jurisdiction over Dinges and Vick. R. Docs. 6, 10. Plaintiff Gasology filed a motion to stay pending arbitration. R. Doc. 6. It claims that the arbitration presently occurring between it, Defendant Vick, and non-party SP Securities should mandate a stay of this litigation in its entirety. R. Doc. 6-1 at 8. Defendants oppose the stay request, arguing, *inter alia*, that the Court should decide whether it has personal

jurisdiction over both Defendants before deciding whether to enter a stay. R. Doc. 13 at 4–6. Gasology argued for resolution of the stay motion first, arguing that a stay is not a merits determination, so it can be resolved before the challenge to personal jurisdiction. R. Doc. 14 at 6.

Defendants filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer to the Southern District of Texas pursuant to 28 U.S.C. § 1404(a). R. Doc. 10. Overall, they argue that Dinges and Vick are both domiciled in Houston, Texas, so this Court can only have specific personal jurisdiction over them. R. Doc. 10-1 at 12–14. Specific jurisdiction will not be found here, though, because the only connection between either of the Defendants and Louisiana is the fortuity of Gasology's headquarters being in New Orleans. *Id.* Plaintiff opposes the motion, generally arguing that both Dinges and Vick targeted Louisiana by contracting with a Louisiana-domiciled company. R. Doc. 20. It asks the Court to transfer this case if it finds that it does not have personal jurisdiction over Dinges and Vick. *Id.* at 20–21.

Because the Court exercises its discretion to address the matter of personal jurisdiction before the request for a stay, the Court will not address the merits of the parties' arguments relative to the motion to stay. The Court here only decides whether it has personal jurisdiction over Dinges and Vick.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) confers a right upon defendants to seek dismissal of any claims against them where personal jurisdiction is lacking. Indeed, personal jurisdiction is "an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (internal quotation marks omitted). "When a nonresident defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Jobe v.*

*ATR Mktg., Inc.,* 87 F.3d 751, 753 (5th Cir. 1996). At the preliminary motion to dismiss stage, a plaintiff need only make a prima facie showing of jurisdiction. *ITL Intern., Inc. v. Constenla, S.A.*, 669 F.3d 493, 496 (5th Cir. 2012). All undisputed facts submitted by the plaintiff in support of jurisdiction, as well as facts contested in affidavits, will be resolved in favor of jurisdiction. *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).

The Due Process Clause of the Fourteenth Amendment governs the Court's exercise of jurisdiction. "A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Latshaw v. Johnson*, 167 F.3d 208, 211 (5th Cir. 1999). Here, Louisiana's long-arm statute, La. R.S. § 13:3201(B), extends jurisdiction to the constitutional limit, providing that a court "may exercise personal jurisdiction over a nonresident on any basis consistent with . . . the Constitution of the United States." As such, the "two inquiries fold into one," and a separate analysis of the Louisiana long-arm statute and due process is unnecessary. *Luv N' care*, 438 F.3d at 469. The sole question before the court, then, is whether the defendant has meaningful "contacts, ties, or relations" with Louisiana, such that the exercise of jurisdiction over the defendant would not offend constitutional due process. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945).

These contacts, ties, and relations may manifest in the Court having general personal jurisdiction, specific personal jurisdiction, or both. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). Where a defendant has "continuous and systematic general business contacts" with the forum state, the court may exercise "general" jurisdiction over any action brought against that defendant. *Id.* Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum."

*Id.* Here, Plaintiff does not argue that this Court has general jurisdiction over Defendants Dinges and Vick. *See* R. Doc. 20 (Plaintiff arguing only specific jurisdiction). Therefore, this Court only assesses the presence of specific jurisdiction.

To satisfy the constitutional requirements for specific jurisdiction, due process requires a showing of "(1) minimum contacts by the defendant purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable." *ITL Intern.*, 669 F.3d at 498. Once a plaintiff establishes the first two requirements, the burden shifts to the defendant to demonstrate that the exercise of personal jurisdiction would be unfair or unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

For Plaintiff to establish personal jurisdiction, "[p]roof by a preponderance of the evidence is not required" at this stage in the proceedings. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990). The Court may consider affidavits, depositions, and other documentation outside of the plaintiff's complaint when determining whether personal jurisdiction exists. *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332 (5th Cir. 1982). The Court must accept the allegations contained in plaintiff's complaint as true—except for those which are either controverted by the defendant or are simply conclusory statements, and conflicts between the parties' facts will be resolved in the plaintiff's favor. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001).

## IV.    LAW & ANALYSIS

Gasology, as the party invoking this Court's jurisdiction, bears the burden of demonstrating that Dinges and Vick individually created sufficient minimum contacts with Louisiana as to both the contracts claims and the tort claims. *See Savoie v. Pritchard*, 122 F.4th 185, 190 (5th Cir. 2024). Vick invoked the fiduciary shield doctrine, arguing that her status as a non-party to the

Syren Agreement "presumptively bars the exercise of personal jurisdiction over her individually based on any acts she may have undertaken in her capacity as Syren [Capital]'s CEO and Managing Partner." R. Doc. 10-1 at 13. The Court will first address whether Gasology has overcome Vick's invocation of the fiduciary shield doctrine. Then, the Court will turn to address whether Vick and Dinges created sufficient minimum contacts with Louisiana as to both the contracts and the torts claims. The minimum contacts analysis differs as to the contract and tort claims. As such, the Court takes each in turn.

### a. Vick Is Protected from Tort Claims by the Fiduciary Shield Doctrine.

The fiduciary shield doctrine serves as an obstacle to establishing personal jurisdiction by preventing its exercise "based solely on acts undertaken in a defendant's corporate capacity." *Savoie*, 122 F.4th at 191. The Fifth Circuit has "proceeded cautiously" in finding that the Louisiana Supreme Court permits use of the doctrine. *Id.* In so finding, the circuit explained that Louisiana law provides that "contacts made in [a defendant's] corporate capacity do not count against h[er] unless one of two exceptions apply: (1) the defendant allegedly engaged in a tort for which [s]he may be personally liable, or (2) the plaintiff demonstrates cause to pierce the corporate veil." *Id.* (citing Louisiana state court cases). As Gasology does not attempt to plead in its Petition, nor argue in its opposition, that this Court should pierce Syren Capital's corporate veil, the Court proceeds by only assessing whether Gasology has demonstrated that Vick engaged in a tort for which she may be personally liable. *See* R. Doc. 1-1; R. Doc. 20.

And to be clear, the allegations in the Petition and the remaining record evidence consistently categorizes Vick's actions as those done in continuous breach of her fiduciary duties to Gasology under the Syren Contract. *See generally* R. Doc. 1-1. Therefore, this analysis will proceed as if all the injurious conduct alleged to have been engaged in by Vick was done in her

capacity as the corporate representative of Syren Capital. None of the allegations seem to point to any tortious conduct committed by Vick unrelated to the Syren Contract. Thus, if this Court is to exercise personal jurisdiction over any of the tort claims asserted against Vick, it must find that Gasology overcame the fiduciary shield doctrine by demonstrating that Vick fostered minimum contacts with Louisiana while engaging in tortious conduct in the forum.

"When a nonresident defendant commits a tort within the state . . . that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state . . . to exercise personal adjudicative jurisdiction." *Guidry v. United States Tobacco Co., Inc.*, 188 F.3d 619, 628 (5th Cir. 1999); *see also Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) (finding that "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment" because the "defendant is purposefully availing himself of 'the privilege of causing a consequence'" in the forum). "Therefore, even without other contacts, jurisdiction would exist if [the defendant] committed a tort while in the state." *Moncrief Oil Intern., Inc. v. OAO Gazprom*, 481 F.3d 309, 314 (5th Cir. 2007).

To be clear, "[t]he proper question is not whether [the plaintiff] experienced an injury in a particular location, but whether [the defendant's] conduct connects it to the forum in a meaningful way." *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 103-04 (5th Cir. 2018). Instead, a "forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on *intentional conduct* by the defendant *that creates the necessary contacts* with the forum.'" *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)) (emphasis added). "A plaintiff's or third party's unilateral activities cannot establish minimum contacts between the defendant and the forum state." *Moncrief*, 481 F.3d at 311 (citing *Hydrokinetics, Inc. v. Alaska*

*Mech., Inc.*, 700 F.2d 1026, 1028 (5th Cir. 1983)). Still, "[a] single act directed at the forum state can confer personal jurisdiction so long as that act gives rise to the claim asserted." *Id.*

Gasology argues that Vick committed a tort in Louisiana by communicating damaging information to it while it was operating from its headquarters in New Orleans. It asserts that it felt the effects of Vick's tortious actions in Louisiana, so the Court has personal jurisdiction over Vick because she intentionally caused a consequence in Louisiana. R. Doc. 20 at 12–13. But "effects" jurisdiction "is rare" and the Fifth Circuit has "expressly declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to the [Louisiana] resident." *Moncrief*, 481 F.3d at 314. Therefore, the Court will assess whether Gasology has submitted sufficient evidence to show that Vick purposely created minimum contacts with Louisiana by directing tortious conduct into the forum.

The Petition alleges that "Vick disclosed to Gasology" that "Dinges would no longer supply interim financing to bridge [the monetary gaps] to the Series A financing as agreed" and that "Dinges would only continue to fund Gasology on different and much more onerous terms, which included terms that would materially disadvantage Gasology." R. Doc. 1-1 at 4. Gasology avers that the contents of this communication is tortious because as a result of Vick's representations, "it became apparent to Gasology that . . . Vick had gone behind [its] back and marshalled some of Gasology's existing investors for commitments to express that they would not provide additional SAFE funding to starve Gasology of working capital." *Id.*

Construing the foregoing in a light most favorable to Gasology, and against the backdrop of the rest of the record evidence, Gasology has not submitted enough facts to allow this Court to conclude that Vick committed a tort *in Louisiana*. Gasology failed to allege facts or submit evidence that the torts were committed *while* Vick was communicating with Gasology. *See* R. Doc.

20-1 at 2, Declaration of Joseph LeBlanc ("[Vick] contacted me in Louisiana through emails, telephone calls, and videoconferences. Such contacts were to discuss Gasology's business . . . ."). Despite liberally construing the record, it seems like the only reasonable conclusion is that Vick committed the alleged torts in Houston by communicating with Texas-based investors. R. Doc. 10-3 at 3, Declaration of Mary Susan Vick ("The key prospective investors contemplated [under the Syren Contract] were located in Texas."). She then *later* communicated to Gasology that she had engaged in tortious conduct. *See* R. Doc. 1-1 at 4. The tortious conduct relied upon by Gasology to confer personal jurisdiction over Vick is not the alleged communications between Vick and Gasology—the tortious conduct occurred during communications between Vick and *other investors*, which Gasology does not refute are Texas-based. *Compare* R. Doc. 10-3, Declaration of Mary Susan Vick, *with* R. Doc. 20-1, Declaration of Joseph LeBlanc.

Case law supports this conclusion. Gasology cites to *McFadin v. Gerber*, which explained that an action done outside the forum state can still suffice as a basis for personal jurisdiction "'in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct.'" 587 F.3d 753, 761 (5th Cir. 2009) (quoting *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999)). But that is an oversimplification of the minimum contacts analysis in the context of tort claims. The circuit looks to "the actual content of communications with a forum" to "give rise to intentional tort causes of action" because the defendant, in so communicating, is "purposefully availing [themself] of 'the privilege of causing a consequence'" in Louisiana. *Wien Air*, 195 F.3d at 213. Moreover, the Supreme Court has more recently pronounced that a plaintiff feeling the effect of an injury in the forum state is not enough: "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects h[er] to the forum in a meaningful

way." *Walden*, 571 U.S. at 290; *see also id.* ("[M]ere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows the defendant has formed a contact with the forum State.").

Here, the record evidence at best shows that Vick breached her fiduciary duties to Gasology and committed the other alleged torts when she communicated with investors, not Gasology. From the Court's perspective, Gasology has not alleged any actions taken by Vick that meaningfully connect her allegedly tortious conduct to Louisiana besides the fact that Gasology felt the effects there. Her communications into Louisiana seemed to have placed Gasology on notice that she may have acted tortiously, but, on the facts presently before the Court, her communications into Louisiana were not *themselves* tortious. In short, Gasology has not sufficiently pled actions affirmatively taken by Vick that connect her to Louisiana—not just connect her to Gasology.

In considering what tortious communications could look like, take *Trois v. Apple Tree Auction Ctr., Inc.* for example: there, the Fifth Circuit held that a district court properly found that a nonresident defendant created sufficient minimum contacts when he allegedly misrepresented certain things over the phone even though plaintiff—not defendant—initiated the phone call. 882 F.3d 4485, 490–91 (5th Cir. 2018). The circuit found that the defendant was an active participant on the call and the key negotiating party who made certain allegedly fraudulent representations to the plaintiff regarding his business. *Id.* at 491. That case is inapposite to the case at hand for multiple reasons. First, the court there presumably had sufficient record evidence and/or allegations that plainly explained that a particular defendant made fraudulent statements on the phone call. *Id.* Second, there seemed to be sufficient facts plead or submitted as to the contents of the defendant's fraudulent statements during the particular phone call. *See id.* We have no similar

well pled facts here, nor record evidence, that Vick, for example, made fraudulent representations to Gasology during any phone calls.

The only record evidence here that is somewhat similar are Gasology's vague assertions that Vick "contacted [LeBlanc] in Louisiana through emails, telephone calls, and videoconferences . . . to discuss Gasology's business . . ." and that she "disclosed" to Gasology that her husband would no longer provide the promised interim equity funding. R. Doc. 20 at 13; R. Doc. 20-1 at 2. These allegations are too starved of facts to allow this Court to conclude that Vick committed a tort during a phone call to Gasology. First, the "disclosure" Vick is alleged to have made is relevant to her husband's conduct under the oral contract he purportedly had with Gasology—this is inapposite to the misrepresentations made by the defendant in *Trois* who was alleged to have made fraudulent representations about his business to the plaintiff on a phone call. *See Trois*, 882 F.3d at 491. Moreover, LeBlanc's declaration that Vick contacted him in Louisiana to discuss Gasology's business is too generalized to allow this Court to infer that any tort happened during those communications.

The record evidence here aligns more with the facts in *Sangha v. Navig8 ShipManagement Private Ltd.* than with cases like *Trois* that contemplate specific or isolated moments of communication between plaintiffs and defendants. 882 F.3d 96 (5th Cir. 2018). In *Sangha*, the Fifth Circuit found that the plaintiff did not identify contacts that were legally sufficient to support a finding of personal jurisdiction over the defendant, his former boss. *Id.* at 103. There, plaintiff alleged that his prior employer tortiously interfered with his new employment contract when it sent e-mails to his new employer that ultimately led to the termination of his new employment contract. *Id.* at 98–99. To support his bid for personal jurisdiction over his prior employer, the plaintiff submitted the following contacts: e-mail communications between non-forum-resident

employees of his prior employer to the non-forum-resident new employer; that the new employment contract was confected in Texas; and that the e-mails sent between the employers were targeted at a Texas-formed contract and concerned work to be performed in Texas. *Id.* The foregoing did not demonstrate that his prior employer had *purposeful* contacts with Texas—the circuit instead found this evidence to reflect more fortuitous contact of the prior employer with Texas. *Id.* The circuit concluded that the parties' presence in the Texas forum was a result of *plaintiff's* relationship to the forum, not the defendant's relationship. *Id.* at 104.

Here, Vick is like the prior employer in *Sangha*. The prior employer in that case was alleged to have committed a tort when contacting plaintiff's non-resident new employer; here, Vick is alleged by Gasology to have breached her fiduciary duties, perpetrated fraud, and more, by inducing Gasology's non-resident investors to "express that they would not provide additional SAFE funding to starve Gasology of capital." R. Doc. 1-1 at 4. In *Sangha*, the information about the alleged tortious interference was then communicated to the plaintiff, who felt the effects of the information in Texas. Here, Vick communicated information about her alleged tortious communications with investors to Gasology, who felt the effects of the information in Louisiana. Because "the proper question is not whether [the plaintiff] experienced an injury or effect in a particular location, but whether [the defendant]'s conduct connects it to the forum in a meaningful way," the Court—like the court in *Sangha*—cannot find on the record before it that Vick took affirmative actions to establish contacts with Louisiana by committing a targeted intentional tort in the forum. *Id.* at 103-04.

This Court could exercise personal jurisdiction over Gasology's tort claims against Vick if Gasology submitted sufficient facts to allow this Court to conclude that Vick committed a tort in Louisiana through her intentional conduct that created necessary contacts with Louisiana. Even

construing the record in a light most favorable to Gasology, it has not demonstrated that Vick made the requisite minimum contacts with Louisiana through intentional conduct—that is, tortious conduct that occurred *in* Louisiana. The alleged torts were committed in Texas and later communicated to Gasology in Louisiana. This is not a constitutionally permissible basis on which to find specific jurisdiction. Gasology, therefore, has not shown that it is entitled to hold Vick personally liable for her actions pursuant to the tort exception to the fiduciary shield doctrine.

**b.  This Court Lacks Personal Jurisdiction Over the Tort Claims Against Dinges.**

Dinges cannot invoke the fiduciary shield doctrine because he, not a company owned by him, entered into a non-written agreement with Gasology to provide monthly interim equity funding. Therefore, this Court can exercise personal jurisdiction over Dinges in his personal capacity if it finds that he created sufficient minimum contacts in Louisiana by carrying out a tort in this forum. As explained above, "[t]o establish personal jurisdiction in intentional tort cases, it is 'insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff.'" *Danzinger v. De Llano, LLP v. Morgan Verkamp, LLC*, 24 F.4th 491, 495 (5th Cir. 2022) (quoting *Walden*, 571 U.S. at 286). Instead, a "forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on *intentional conduct* by the defendant *that creates the necessary contacts* with the forum.'" *Id.* (quoting *Walden*, 571 U.S. at 286) (emphasis added).

Whether a tort was committed *in* the forum state is a fact-intensive inquiry. The Fifth Circuit has permitted the exercise of specific personal jurisdiction over an intentional tort claim in cases where a nonresident defendant placed a call to a forum and makes false statements over the phone to a forum resident. *See, e.g.,  Flowers Indus*, 688 F.2d at 332–34 (holding one defamatory phone call initiated by defendant sufficient to establish personal jurisdiction); *see also Lewis v.*

14

*Fresne*, 252 F.3d 352, 358 (5th Cir. 2001) (finding personal jurisdiction in intentional tort claim when nonresident defendant was alleged to have participated in a telephone conference designed to convince plaintiff to make a loan, that the nonresident defendant sent loan documents containing fraudulent misstatements).

As discussed above, Gasology repeatedly represented at oral argument that this Court can assert personal jurisdiction over both Vick and Dinges because they conspired together to assert a hostile takeover over Gasology and conspired together to harm Gasology in Louisiana. But the "Fifth Circuit has never adopted a 'conspiracy theory of jurisdiction.'" *Dykes v. Maverick Motion Picture Grp., LLC*, No. 08-536, 2011 WL 900276, at *6 (M.D. La. Mar. 14, 2011) (quoting *Conwill v. Greenberg Traurig, L.L.P.*, No. 09-4365, 2009 WL 5178310, at *4 (E.D. La. Dec. 22, 2009)). This means that courts, to exercise personal jurisdiction over co-conspirators, must analyze whether the coconspirators *individually* engaged in activities that would satisfy the minimum contacts analysis. *Id.* (citing *Conwill*, 2009 WL 5178310, at *4).

Gasology has not submitted sufficient facts to allow this Court to conclude that Dinges created the individualized, requisite minimum contacts with Louisiana. At oral argument, Gasology argued that it had evidence of Dinges's tortious communications into Louisiana that could demonstrate that Dinges carried out a tort in Louisiana. *See, e.g.*, *Wien Air*, 195 F.3d at 213 (finding that "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment" because the "defendant is purposefully availing himself of 'the privilege of causing a consequence'" in the forum). But Gasology did not submit this evidence into the record, and the Court will not accept unsubstantiated, conclusory allegations as true, even if uncontroverted. *See Panda Brandywine*, 253 F.3d at 869.

The Petition does not allege that Dinges told Gasology that he would cease providing the interim equity funding. *See* R. Doc. 1-1 at 4-5. Instead, it asserts that Vick communicated with Gasology that her husband would "no longer supply interim financing to bridge to the Series A financing as agreed" unless Gasology agreed to "different and much more onerous terms." R. Doc. 1-1 at 4. Gasology does not allege any affirmative actions taken by Dinges that could allow this Court to find that he, for example, answered Gasology's questions on a phone call with misleading, untruthful, fraudulent information. *E.g.*, *Power Funding Ltd. v. Chabad Lubavitch of Sunrise, Inc.*, No. 23-398, 2024 WL 2022289, at *3 (E.D. Tex. May 7, 2024) ("[e]ven if defendants did not initiate the due-diligence calls . . . plaintiffs' well-pleaded allegations are that defendants' representations on those phone calls give rise to a fraud claims"). It would be nonsensical for this Court to find that Dinges purposely reached into Louisiana and committed a tort when the Petition does not allege any action on Dinges's part at all—except conspiring with his wife, presumably in their Houston domicile.

Gasology submitted a declaration of its principal, Joseph LeBlanc, which states that Dinges "contacted [him] in Louisiana through emails, telephone calls, and videoconferences. Such contacts were to discuss Gasology's business, including Dinges' agreement to provide $250,000 per month . . . ." R. Doc. 20-1 at 2. It goes on to state that Mr. LeBlanc "communicated to Dinges that the funds would be used to support Gasology's Louisiana-headquartered operations." *Id.* None of these facts contribute to this Court's analysis of Dinges *himself* creating sufficient minimum contacts with Louisiana. Nor do these facts imply the existence of any tortious conduct committed by Dinges in Louisiana. Overall, the Court wants for facts that show affirmative action on Dinges's part that could allow this Court to find that Dinges himself made efforts to establish minimum contacts with Louisiana.

16

Overall, the Court cannot exercise personal jurisdiction over Vick and Dinges as to the tort claims. On the record before the Court, Gasology has only demonstrated that it felt the effects of allegedly tortious conduct in Louisiana. This alone is insufficient to support the exercise of personal jurisdiction over Vick and Dinges. Personal jurisdiction requires active, not passive, efforts in the forum on the part of the defendants. *See Panda Brandywine*, 253 F.3d at 870 (internal quotation omitted) ("If we were to accept [plaintiff's] arguments, a nonresident defendant would be subject to jurisdiction in [Louisiana] for an intentional tort simply because the plaintiff's complaint alleged injury in [Louisiana] to [Louisiana] residents regardless of the defendant's contacts, and would have to appear in [Louisiana] to defend the suit no matter how groundless or frivolous the suit may be."). The contacts Plaintiff asserts were made by Vick and Dinges are constitutionally insufficient bases on which to rest the exercise of personal jurisdiction.

### c. Personal Jurisdiction Over the Contract Claims

The Court will now turn to assess whether Gasology has met its burden to demonstrate that this Court has personal jurisdiction over Vick and Dinges individually as to the contract claims.

Merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction. *Dykes v. Maverick Motion Picture Grp., LLC*, No. 08-536, 2011 WL 900276, at *4 (M.D. La. Mar. 14, 2011) (citing *Burger King*, 471 U.S. at 472). "An exchange of communications in the course of developing and carrying out a contract [] does not, by itself, constitute the required purposeful availment of the benefits and protections of [Louisiana] law." *Moncrief*, 481 F.3d at 312. "Otherwise, jurisdiction could be exercised based only on the fortuity that one of the parties happens to reside in the forum state." *Id.* Therefore, courts evaluate the subject contracts, the parties' "actual course of dealing," and the parties' "prior negotiations and contemplated future

consequences." *Lansing Trade Grp., LLC v. 3B Biofuels GmbH & Co.*, 612 F. Supp. 2d 813, 820 (S.D. Tex. Apr. 27, 2009) (quoting *Burger King,* 471 U.S. at 479).

"[T]hat the contract between the plaintiff and defendant is expressly governed by law of another state militates against a finding that the defendant availed himself of the forum state's laws." *Id.* (citing *Burger King*, 471 U.S. at 472). But courts will find specific jurisdiction over contract claims when the forum state was "clearly the hub of the parties' activities" and when a defendant chose to contract with a forum state resident because the defendant wished to benefit from doing business in the forum state. *Miss. Interstate Exp., Inc. v. Transpo, Inc.*, 681 F.3d 1003, 1010–11 (5th Cir. 1982); *Cent. Freight Lines, Inc. v. APA Transp. Co.*, 322 F.3d 376, 382 (5th Cir. 2003). However, courts must be mindful that "a plaintiff's unilateral activities in [Louisiana] do not constitute minimum contacts where the defendant did not perform any of its obligations in [Louisiana], the contract did not require performance in [Louisiana], and the contract is centered outside of [Louisiana]." *Moncrief*, 481 F.3d at 312.

Here, the Court will first address whether Gasology may bring contract claims against Vick in her individual capacity, though the Syren Contract is between Gasology and Syren Capital. It will then assess whether Gasology's contractual relationship with Dinges as to the interim equity funding will allow this Court to find that Dinges created sufficient minimum contacts with Louisiana.

### i.    Vick Is Protected by the Fiduciary Shield Doctrine.

Vick may invoke the fiduciary shield doctrine, as discussed above, because it "prevents the exercise of personal jurisdiction based solely on acts undertaken in a defendant's corporate capacity." *Savoie*, 122 F.4th at 191. Gasology consistently categorizes Vick's conduct as relevant to the Syren Contract—not relevant to any contract between Gasology and Vick individually. *See* R. Doc. 1-1. Moreover, as discussed above, Gasology has not succeeded in demonstrating that the

contacts made in Vick's corporate capacity count against her because it failed to pursue showing cause to pierce the corporate veil, and its failed to show that Vick committed a tort in Louisiana for which she may be personally liable—apart from actions related to a conspiracy, which cannot be used as a jurisdictional basis in the Fifth Circuit. *Savoie*, 122 F.4th at 192; *Dykes*, 2011 WL 900276, at *6 (discussing that courts must find that each co-conspirator individually committed overt acts in the forum in furtherance of the conspiracy or otherwise have engaged in individual activities that would satisfy the minimum contacts analysis); *see also United My Funds, LLC v. Perera*, No. 19-373, 2020 WL 674364, at *4–5 (E.D. Tex. Feb. 11, 2020) (finding conspiracy allegations irrelevant to the jurisdictional analysis and that plaintiff did not show the alleged conspirator-defendants individually established sufficient minimum contacts beyond the conspiracy-related allegations).

Even if Gasology could demonstrate cause to lower the shield, the facts surrounding the contract militate against a finding of minimum contacts in Louisiana. First, the Syren Contract is between two Delaware companies, was negotiated to be governed by Delaware law, and contained a Delaware venue clause. R. Doc. 10-3 at 6, 11. The only mention of Louisiana in the contract is in reference to the location of Gasology's headquarters. *Id.* at 6. The contract also did not contemplate a specific location of performance. *See id.* at 6–17. And when contemplating Vick's performance under the contract—undertaken in her corporate representative, not individual, capacity—her actions appear to favor Texas, not Louisiana.

The Syren Contract obligated Syren Capital to "represent [Gasology] as its financial advisor in connection with the managing the Series A funding process to a Close with a discrete set of prospective investors identified by Gasology." *Id.* at 6. Both the Syren Contract and Mr. LeBlanc's declaration are silent as to the location/domicile/principal place of business of these

investors. *See* R. Doc. 10-3 at 6–17 R. Doc. 20-1 at 1–3. However, Vick's declaration avers that "[t]he key prospective investors were located in Texas[, and that n]o prospective investors were located in Louisiana." R. Doc. 10-3 at 3. Thus, Louisiana was clearly not the "hub" of the parties' activities under the contract, and presumably Syren Capital's obligations under the contract could have been performed from anywhere. *See Moncrief*, 481 F.3d at 313 (finding the plaintiff's argument unavailing that Texas was an appropriate forum because the plaintiff performed its obligations under the contract in Texas when the contract was silent as to the location of plaintiff's performance and because the nature of the work could cause plaintiff to undertake its performance from anywhere).

This Court relates to the position of the court in *Alack Refrigeration Co., Inc. v. W.C. Zabel Co.*, where it was explained that the plaintiff there "confused [the company] with the individual defendants by using [an] ambiguous phrase 'the [Company] defendants' in an attempt to impute the actions of [the company] to the individual owners." No. 15-756, 2015 WL 8273498, at *4 (E.D. La. Dec. 8, 2015). There, the court refused to impute the company's contacts with Louisiana onto any of the individual defendants because the plaintiff did not raise or prove any of the theories that would allow the court to disregard the corporate entity. *Id.*; *see also Willow Bend, LLC v. Downtown ABQ Partners, LLC*, 612 F.3d 390, 393 (5th Cir. 2010) ("[Plaintiff] sued for breach of *contract* and breach of *fiduciary duty*, after all, and a defendant cannot be said to have breached a contract it never made or to have skirted a duty it never assumed."). The same applies here. The Court does not have personal jurisdiction over Vick with respect to the contract claims Gasology brings against her relevant to the conduct she undertook as the corporate representative of Syren Capital.

### ii. Insufficient Evidence of Dinges's Minimum Contacts Related to the Oral Agreement to Provide Interim Equity Funding.

Next, the Court will assess the facts and circumstances surrounding Dinges's unwritten agreement to provide Gasology with interim equity funding while his wife carried out the Series A fundraise. Gasology argues that Dinges fostered sufficient minimum contacts with Louisiana as to the contract claims because he made a deliberate choice to invest in a Louisiana company that carried out all its work from Louisiana. R. Doc. 20 at 8–9. Dinges's SAFE investments also took effect in Louisiana when Gasology spent the money. *Id.* at 9. Similarly, Dinges wired money from Texas to Gasology's bank in Louisiana. *Id.* Importantly, Gasology argues that it told Dinges that Gasology's would use his interim equity funding to make payroll obligations to its Louisiana employees and fund the New Orleans's office's operational costs. *Id.* at 12; R. Doc. 20-1 at 2. Their position is that overall, Dinges's conduct with Gasology shows that he wished to facilitate business activity in Louisiana by assisting Gasology in growing its business from its headquarters in Louisiana.

Gasology's arguments are unavailing. Here, the Court "must ask whether the nonresident's forum contacts were instrumental in the formation of its contract or its breach." *Lansing*, 612 F. Supp. 2d at 821 (citing *Burger King*, 471 U.S. at 478). There is insufficient record evidence to show that Louisiana was a relevant consideration in Dinges's choices to invest in Gasology. For example, it is unrefuted that Gasology's principal, Joseph LeBlanc, reached out to Dinges—in Texas—to solicit investments at the start of Gasology's and Dinges's working relationship. R. Doc. 10-2 at 1. This shows agency on Gasology's part, not Dinges's, and that Gasology reached into Texas to develop a business relationship with Dinges. None of the record evidence supports an inference that Dinges actively sought out discussions with Gasology to join in as an investor, which could have been a supporting factor in the minimum contacts analysis.

21

Moreover, Gasology consistently represents that the purpose of the company is to create an online motor fuel marketplace. *See* R. Doc. 1-1 at 1. It does not submit facts that the company specifically targets the Louisiana motor fuel marketplace and desires to actively build out any physical presence in Louisiana that could facilitate Louisiana-specific business activities. Thus, Gasology's arguments that Dinges sought to facilitate business growth in Louisiana is counterintuitive to its representations of the company's goals. Even conceding that Dinges may have been aware that his interim equity funding would be used to fund Gasology's overhead costs that were incurred in New Orleans, that is inapposite to the kind of business-facilitation that could give rise to minimum contacts contemplated by the Fifth Circuit in other cases. *See Central Freight*, 322 F.3d at 382 (finding personal jurisdiction over nonresident defendant who, among other things, entered into a contract "presumably kn[owing] that many of [the plaintiff's] customers would also come from" the forum state); *Transpo*, 681 F.2d at 1011 (finding a nonresident defendant had sufficient minimum contacts because it entered into a continuous commercial contractual relationship with the forum plaintiff that obligated the defendant to call the plaintiff in the forum state to give plaintiff directions as to shipments to be made from the forum state, and where contract contemplated plaintiff's forum-state headquarters as the storage and repair location for the shipping trucks).

Additionally, the Fifth Circuit has found that insufficient contacts can "include mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and even sending representatives to the forum state." *Lansing*, 612 F. Supp. 2d at 821; *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004) (finding the relevance of defendants' wire payments into the forum and contract-related discussions with forum-resident plaintiff diminished when contract governed by non-forum state law and was to be

performed outside of the forum). Thus, that Dinges wired payments to Gasology in Louisiana will not alone allow this Court to find minimum contacts. *See United My Funds*, 2020 WL 6774364, at *4 ("[R]eceiving a wire transfer . . . is not sufficient to establish minimum contacts without more.").

An obstacle for both this Court and for Gasology is that the agreement between Dinges and Gasology that forms the basis of Gasology's claims is not governed by an executed contract, which Gasology confirmed at oral argument. And at the oral argument, Gasology did not discuss any material aspects of the oral contract that the Court would look to if it were written—the place of contemplated performance for each party, the governing law should a dispute arise, and overall, whether the contract had any meaningful connection with Louisiana beyond the fortuity of Gasology being headquartered there. Additionally, the record before the Court does not provide facts to show that Dinges created sufficient minimum contacts with Louisiana when promising to give Gasology monthly funding. Gasology has thus not met its burden to demonstrate that Dinges made unilateral efforts to reach into Louisiana to foster business activity in a way that could support the Court's exercise of jurisdiction.

### d.  Assessing Personal Jurisdiction Before Assessing a Stay

This Court decided to address whether it could exercise personal jurisdiction over the claims in this suit largely because two of the three parties here are not signatories to the relevant arbitration agreement. Defendants describe the position of the parties clearly: "Gasology, the plaintiff in this action and the purported beneficiary of an arbitration clause in Ms. Vick's contract with FINRA (to which Gasology is *not* a signatory), requests a stay as to Mr. Dinges, a defendant in this action and a non-signatory to *any* arbitration agreement *who also has claims against Gasology*. In effect, Gasology is both (1) a non-signatory arbitrating plaintiff seeking a stay against

a non-signatory defendant and (2) a non-signatory arbitrating defendant seeking a stay against a non-signatory plaintiff." R. Doc. 13 at 9. Considering the unique position of the parties in this litigation, this Court found it proper to first establish whether it had personal jurisdiction over Dinges, who is not and *cannot* be a party to the FINRA arbitration, before addressing the requested stay. *See* R. Doc. 14 at 4 (Gasology conceding that Dinges was unable to join in the arbitration because of FINRA's restrictions).

Gasology is correct that this Court could have addressed the arbitration motion first. *Id.* at 6. It cites to *Westport Petroleum, Inc. v. Stena Bulk, Ltd.* for the proposition that "the motion to stay can be resolved before the challenge to personal jurisdiction." No. 05-4158, 2006 WL 4586213, at *4-5 (S.D. Tex. Sept. 5, 2006). There, a district court in this circuit stated that it "may rule on the motion to stay before resolving [defendant's] motion to dismiss for lack of personal jurisdiction and improper venue" because a motion to stay "merely delays the litigation [and] is not a ruling on the merits." *Id.* However, this case is distinguishable from the facts in *Westport Petroleum* because the plaintiff there requested jurisdictional discovery to support its opposition to the motion to dismiss, and the court felt "[t]hat discovery would likely extend to matters that are also at issue in the pending arbitrations." *Id.* at *5. Thus, "[a]llowing discovery [on personal jurisdiction] before deciding the motion to stay pending the arbitration would be inconsistent with the reasons for staying the litigation while the arbitration proceeds." *Id.*

That court assessed the individual circumstances of the parties—like this Court does here—when deciding how to manage its pending motions. Between the jurisdictional and the arbitral concerns, this Court determined that it was in the best interest of all parties, and the best interest of judicial economy, to address the personal jurisdiction question first.

24

### e. Transfer of Venue

Defendants made the initial request to transfer this case to the Southern District of Texas strictly as an alternative if the Court is disinclined to dismiss this action for lack of personal jurisdiction. R. Doc. 10-1 at 23. Gasology joined in this request and asked that this case be to the Southern District of Texas should the Court find an absence of personal jurisdiction as to all the claims. R. Doc. 20 at 20–22.

Courts have the authority to transfer cases when they lack personal jurisdiction. *Herman v. Cataphora, Inc.*, 730 F.3d 460, 466 (5th Cir. 2013); *Bentz v. Recile*, 778 F.2d 1026, 1028 (5th Cir. 1985). There is a statutory alternative to a court's dismissal of an action pursuant to Fed. R. Civ. P. 12(b)(2): under 28 U.S.C. § 1406(a), a district court is authorized to transfer a case to "any district or division in which it could have been brought" if the case was brought "in the wrong division or district . . . or if it [would] be in the interest of justice." The Fifth Circuit has "explained that a division or district may be 'wrong' under Section 1406(a) when the original court lacks personal jurisdiction." *Herman*, 730 F.3d at 466 (citing *Bentz*, 778 F.2d at 1028). Therefore, when a Court lacks personal jurisdiction over defendants, it can exercise its authority under 28 U.S.C. § 1406(a) to transfer the case to "any division or district in which it could have been brought."

Importantly, Plaintiff does not dispute that this cause of action could have been brought in the Southern District of Texas. R. Doc. 20 at 19–20. Plaintiff instead expressly asks that this matter be transferred to the Southern District of Texas instead of being dismissed if personal jurisdiction is found to be is lacking over Dinges and Vick. *Id.* at 20. This Court has indeed found that it lacks personal jurisdiction as to any of the claims brought in this forum against Dinges and Vick. As a result, the Court will exercise its statutory authority to transfer this case to the Southern District of Texas, where all parties concede this case could have been brought.

This determination is also in the interest of justice. As Plaintiff noted in its briefing, "various witnesses, included Dinges and Vick, are available in Texas, and proof of their unlawful activity can likely be found there." R. Doc. 20 at 19. Even more, Plaintiff represents that "the Southern District of Texas [would be] the only available forum where this litigation may proceed" if this Court were to find that it does not have personal jurisdiction over Dinges and Vick. *Id.* at 19–20. As an aside, it is telling to this Court that in defending its choice of venue, Gasology avers that it "has chosen to pursue this action in the Eastern District of Louisiana, which is the forum of *its* principal place of business" as opposed to attributing its choice of venue to the contacts of the Defendants, as required by due process. *Id.* at 20 (emphasis added).

Accordingly, this Court will exercise its authority under 28 U.S.C. § 1406(a) to transfer this case to the Southern District of Texas, where the Court is aware of a related case.[1]

## V.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that this case be **TRANSFERRED** to the Southern District of Texas for further proceedings, where this Court is aware of a related pending lawsuit. *See Dan O. Dinges v. Gasology, LLC and Joseph LeBlanc*, Southern District of Texas Docket No. 25-03484.

**IT IS FURTHER ORDERED** that Defendants' motion to dismiss for lack of personal jurisdiction, R. Doc. 10, is **DENIED AS MOOT** in an abundance of caution and in consideration of the Fifth Circuit's vacatur of an order in a similar case. *See Herman v. Cataphora, Inc.*, 730

---

[1]    At the September 17, 2025, oral argument, Defendants submitted a copy of Plaintiff's Memorandum in Support of Motion to Transfer that it filed the day before in the ongoing related lawsuit *Dan O. Dinges v. Gasology, LLC and Joseph LeBlanc*, Southern District of Texas No. 25-03484, at R. Doc. 17-1. In it, Gasology argued that "whether Dinges and Vick are subject to personal jurisdiction in the Eastern District of Louisiana is purely a question for the Eastern District of Louisiana." R. Doc. 17-1 at 12. The Eastern District has decided, and it has found that it does not have personal jurisdiction over Dinges and Vick as to any of the claims asserted against them by Gasology. Therefore, the first-to-file rule cannot apply here, as a key jurisdictional component is missing from Gasology's attempt to press its claims in this judicial district.

F.3d 460, 466 (5th Cir. 2013) (vacating this Court's grant of a motion to dismiss pursuant to 12(b)(2) and order transferring case, with direction to this Court to instead enter an order *just* transferring the case).

**IT IS FURTHER ORDERED** that Plaintiff's motion to stay pending arbitration, R. Doc. 6, is hereby **DENIED AS MOOT**.

New Orleans, Louisiana, this 22nd day of September, 2025.

THE HONORABLE ELDON E. FALLON